UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                     CRIMINAL NO. 3:18-CR-00165-CWR-FKB-1

JESSIE BULLOCK




DETENTION HEARING




BEFORE THE HONORABLE F. KEITH BALL
UNITED STATES MAGISTRATE JUDGE
APRIL 2, 2020
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE GOVERNMENT:    MR. CHET KIRKHAM

FOR THE DEFENDANT:    MR. MICHAEL SCOTT




REPORTED BY:  AMY KEY
            Registered Professional Reporter
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1                        TABLE OF CONTENTS

2          Exhibit G-1   ...................................6

3     MICHAEL PARTEN                                   6

4       Direct Examination By Mr. Kirkham  .................6

5       Cross-Examination By Mr. Scott  ...................11

6     ELLA BULLOCK                                    14

7       Direct Examination By Mr. Scott  .................14

8          Exhibit D-1   ..................................16

9          Exhibit D-2   ..................................18

10      Cross-Examination By Mr. Kirkham  .................18

11      Redirect Examination By Mr. Scott  ...............28

12      Redirect Examination By Mr. Scott  ...............34

13         Exhibit G-2   ..................................36

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Hello, Mr. Bullock.

2          THE DEFENDANT:  Hello.  How you doing, Your Honor?

3          THE COURT:  I'm doing well.  Mr. Bullock, will you --

4    I'm going to call the case, and then I'm going to have you

5    raise your right hand.

6          The Court calls *United States V. Jessie Bullock*,

7    Criminal No. 3:18-cr-165.

8          Mr. Bullock, will you raise your right hand, please,

9    sir?

10      (Defendant Sworn)

11         THE COURT:  Will you state your full name for the

12   record, please, sir?

13         THE DEFENDANT:  Jessie Bullock.

14         THE COURT:  That's right.  It's not Bullock.

15   It's "Bul-lock."  I apologize.  Mr. Bullock, it's my

16   understanding that you have signed a consent and waiver of the

17   arraignment in this matter, and that you've been advised of

18   what the charge is against you by your attorney, and that you

19   have waived arraignment; is that correct?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  And who from the jail is there with you?

22         MS. HANDY:  (Inaudible) Handy, Your Honor.

23         THE COURT:  Ms. Handy, how are you?

24         MS. HANDY:  I'm good.  How are you?

25         THE COURT:  I'm doing well.  So y'all are going to

1    e-mail that back to us, correct?

2            MS. HANDY:  All the paperwork that was done today; is

3    that correct?

4            THE COURT:  Well, I guess what I'm really asking is,

5    do you have the waiver of arraignment that he signed?

6            MS. HANDY:  Hold on a second.  Okay.  I have it.

7            THE COURT:  All right.  If you will --

8            MS. HANDY:  Send it now?

9            THE COURT:  No, I don't need it now.  I just want to

10   make sure that you've put your eyes on it and you see that a

11   waiver of arraignment has been signed?

12           MS. HANDY:  Waiver of appearance and entry of not

13   guilty plea?  Is that the paperwork?  Yeah, I have it.  It has

14   been signed.

15           THE COURT:  All right.  That sounds good.

16           Mr. Bullock, that's your decision, and you did sign

17   that form, correct?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  All right.  We will now proceed to the

20   detention hearing.  But you should have a consent to proceed by

21   video conference form in front of you.  That is just if you --

22   do you wish to consent to having your detention hearing with

23   you joining us just by video conference?  Is that your

24   decision, Mr. Bullock?

25           THE DEFENDANT:  Yes, sir.

 1            THE COURT:  Are you willing to proceed with your

 2   detention hearing without you being able to be physically

 3   present and joining just by video conference?

 4            THE DEFENDANT:  Yes, sir, I'm willing.

 5            THE COURT:  All right.  If you will, sign that form,

 6   please, sir.

 7            MS. HANDY:  Okay.  It's signed.

 8            THE COURT:  All right.  Thank you, Ms. Handy.

 9            MS. HANDY:  You're welcome.

10            THE COURT:  Is the government ready to proceed?

11            MR. KIRKHAM:  Yes, Your Honor.

12            THE COURT:  Is the defendant ready to proceed?

13            MR. SCOTT:  Yes, Your Honor.

14            THE COURT:  Does anyone wish to invoke the rule?

15            MR. KIRKHAM:  I don't think there are any witnesses --

16            THE COURT:  I don't think there are either.  Okay.

17   The government may call its first witness.

18            MR. KIRKHAM:  Your Honor, the government would first

19   proffer the pretrial services report prepared by probation,

20   Your Honor.

21            THE COURT:  Any objection?

22            MR. SCOTT:  No objection, Your Honor.

23            THE COURT:  All right.  The pretrial services report

24   is received into evidence as Government's Exhibit 1 under seal.

25            MR. KIRKHAM:  Thank you, Your Honor.

1        (EXHIBIT G-1 MARKED)

2              MR. KIRKHAM:  The government calls Michael Parten.

3              THE COURT:  All right.  Agent Parten, if you'll come

4    to the stand, please, sir.  Turn and face the Court and raise

5    your right hand when you get there.

6        (Witness Sworn)

7              THE COURT:  You may be seated.  You may proceed.

8              MR. KIRKHAM:  Thank you, Your Honor.

9                          MICHAEL PARTEN,

10     having first been duly sworn, testified as follows:

11                       DIRECT EXAMINATION

12   BY MR. KIRKHAM:

13   Q   Please state your name for the record.

14   A   I'm Special Agent Michael Parten with the Bureau of

15   Alcohol, Tobacco, Firearms & Explosives.

16   Q   And how long have you been with ATF?

17   A   Fourteen years.

18   Q   We're here today on a case against a Jessie Bullock.  Are

19   you the case agent on that case?

20   A   Yes.

21   Q   If you would, please tell the Court, how did these charges

22   come about?  How did you first become involved in the

23   investigation?

24   A   In 2018, Mr. Bullock -- or Jackson Police Department

25   received a 911 call to Mr. Bullock's address where he was

1   holding his wife hostage at gunpoint.  And they -- ultimately,

2   she was let go, and he was taken into custody.  And after his

3   arrest, he did admit to possession of a firearm during that

4   event -- or that day of the event.

5   Q   Who interviewed him?

6   A   It's a former ATF task force officer, a current police

7   officer with the Jackson Police Department, Tariq Williams.

8   Q   And what's a summary of what was said during that

9   interview?

10  A   Well, with that direct interview with Mr. Bullock, it was

11  said that he has argued with his wife before, and at earlier

12  points in their marriage has become physical with her, but he

13  denied having possession -- or holding her at gunpoint or

14  threatening or causing harm to her that day.  But he did admit

15  that he had handled that firearm earlier in the day, because it

16  was in the drawer in his bedroom.

17  Q   So he admitted to knowing about a firearm in the house?

18  A   Yes.  And he also discussed his previous felony

19  convictions.

20  Q   And you said that he had physical contact with that firearm

21  when it was in a drawer; is that correct?

22  A   Correct.  He said he had -- when asked if he had -- first,

23  he was asked if he had held his wife at gunpoint.  He said,

24  "No."  And then he was asked if he had actually handled the

25  firearm, a .22 revolver.  And he said, yes, he had moved it and

1    that he had actually held it that day while utilizing the

2    drawer that the gun was contained in.

3    Q   Was that firearm recovered?

4    A   Yes.

5    Q   And was it examined by someone with ATF?

6    A   It was.

7    Q   Was that firearm manufactured outside the State of

8    Mississippi?

9    A   It was.

10   Q   Were any other witnesses interviewed as part of the

11   investigation of this case?

12   A   They were.  His wife and his daughter.

13   Q   What's the substance of the wife's statement?

14   A   Ms. Ella Bullock, his wife of several years, decades, said

15   that he -- that they had an argument earlier in the day and

16   that it had escalated to him ultimately dragging her out of her

17   car as she was trying to get their grandchild out -- her and

18   her grandchild out of the house.  And he drug her back into the

19   car where she stated he had, I believe, drug and beaten her or

20   stomped her.  He had -- once he got her in the house, he had

21   stripped her down and placed her -- told her to get into a

22   bathtub at one point, had held a gun to her head, threatened

23   her that if she left he would blow her brains out.  He had

24   showed her the cocked gun to further express that he would use

25   the gun on her.

1    Q    And who was --

2    A    And this was the same firearm that was in the drawer that

3    he admitted to moving or handling at some point earlier that

4    day.

5    Q    Who was the other witness who was interviewed?

6    A    His daughter, Ms. Chelsea Bullock.

7    Q    And what did she say?

8    A    It was in line with what Ms. Ella Bullock had said.  She

9    mentioned earlier in the day that she had gone to the gym.  She

10   was contacted by her brother -- I don't know his name -- and

11   advised that her parents were arguing and would she please go

12   check on them.  She went back.  I believe she contacted her

13   mother by phone or she arrived in the house -- let's see.  I

14   have some notes.

15       Ms. Chelsea Bullock stated that -- she got into the house,

16   and he was in the room, I assume, I think the bedroom, and had

17   a gun in his hand.  She went to get her child out, but he would

18   not let her mother out.  He had a gun to her head.  She

19   described it as a black, skinny gun.  And she began to further

20   state that the gun was to her mom's head.

21       He stated that he wanted to shoot her and that he would --

22   that if Chelsea Bullock called the police, that he was going to

23   blow Ella's brains out.  At some point she advised that he

24   pointed the firearm at her.  And when asked if he ever wielded

25   the gun or pulled a weapon on her or anyone else in the house,

1  she said, "Plenty of times in the past."  But she said that he

2  pointed the gun at her but that she was able to leave the house

3  anyway with her son.

4  Q   Was the description of gun that she gave, was that

5  consistent with the firearm that was recovered?

6  A   That's correct.  Her and her mother were describing the gun

7  together.  That it was -- she described it as a long, skinny

8  gun, a black gun.  And Ms. Ella Bullock further described it as

9  a pistol but that is has a "long thing."  I took that -- I

10  believe she was describing the barrel.

11          MR. KIRKHAM:  Court's indulgence for a moment, please.

12          THE COURT:  Uh-huh (affirmative response).

13  BY MR. KIRKHAM:

14  Q   You are testifying from some -- you have some notes in aid

15  of your testimony up there today; is that correct?

16  A   I've taken notes from watching the video interview of

17  Mr. Bullock, and then there was an audio interview of

18  Ms. Chelsea and Ms. Ella Bullock, and I took notes from those

19  interviews.

20          MR. KIRKHAM:  May I approach the witness, Your Honor?

21          THE COURT:  You may.

22          MR. KIRKHAM:  I think defense counsel is reviewing the

23  notes, but I would I tender the witness at this time, Your

24  Honor.

25          THE COURT:  Any cross-examination?

```
 1              MR. SCOTT:  Yes, sir.  May I proceed, Your Honor?

 2              THE COURT:  You may.

 3                            CROSS-EXAMINATION

 4    BY MR. SCOTT:

 5    Q    Agent Parten, you've been with ATF for 14 years?

 6    A    Yes.

 7    Q    Where were you before that?

 8    A    I was an insurance adjuster.

 9    Q    Where did this incident occur?

10    A    In Jackson, Mississippi at their residence.

11    Q    At their residence?

12    A    Yeah.

13    Q    And that would be --

14              MR. SCOTT:  Court's indulgence.

15    BY MR. SCOTT:

16    Q    Or do you have that?

17    A    It's on the police report.  It is -- it says 5031 Thornwood

18    Place, Jackson, Mississippi 39206.

19    Q    And are you familiar with where Mr. Bullock was arrested?

20    A    I'm sorry.  Let me -- okay.  That is the correct address.

21    Go ahead.

22    Q    Are you familiar with where Mr. Bullock was arrested on

23    this indictment?

24    A    It's my understanding it was at his residence.

25    Q    The Thornwood residence?
```

```
1    A    Correct.

2    Q    Okay.

3    A    I believe.  That's what I'm told by the U.S. Marshals.

4    Q    Do you know how he was released from Hinds County Jail or

5    when?

6    A    No, sir.

7    Q    Do you know of any bond situation in that case?

8    A    I don't.

9    Q    Since he was released, has there been any incidences?

10   A    No, sir.

11   Q    Do you know the status of the Hinds County case?

12   A    I was speaking to Officer Williams yesterday, and he

13   didn't -- I was asking him about that, and he wasn't aware of

14   it either.  So, no, I don't know the status.

15   Q    Do you know -- you said -- well, do you know how much bond

16   he was given in Hinds County?

17   A    I don't.

18   Q    Now, he was arrested in May of 2018 at the -- I think it

19   was the Thornwood Place residence?

20   A    Correct.

21   Q    And he was arrested on this indictment at the Thornwood --

22   A    At the same address, yes, sir.

23   Q    Who else lives there now?

24   A    Now?

25   Q    Yes.
```

1   A   I don't know.  I believe his wife still lives with him and

2   he does.  I'm not sure if Chelsea does, who did stay there on

3   and off at the time of the original event in 2018.  But I don't

4   know the occupant -- or who lives there now.

5   Q   So he still lives with the wife that he's accused of

6   kidnapping?

7   A   It's my understanding that he does.

8            MR. SCOTT:  Court's indulgence, Your Honor.

9            THE WITNESS:  If you look in the top right corner of

10  those, you'll see which individual is speaking that it pertains

11  to.

12       (SHORT PAUSE)

13            MR. SCOTT:  No further questions, Your Honor.

14            THE COURT:  All right.

15            MR. SCOTT:  May I return these?

16            THE COURT:  Yes.  Any redirect?

17            MR. KIRKHAM:  No, Your Honor.

18            THE COURT:  Thank you, Agent Parten.  You're excused.

19            Does the government have any additional witnesses or

20  evidence to submit to the Court?

21            MR. KIRKHAM:  The government rests on its case in

22  chief, Your Honor.

23            THE COURT:  All right.  The government having rested,

24  does the defendant have any witnesses or other evidence to

25  submit to the Court?

```
 1              MR. SCOTT:  Yes, Your Honor.  I call Ella Bullock.  If
 2    I may step outside to get her?
 3              THE COURT:  Yes.
 4              Ms. Bullock, if you'll come walk up the ramp here,
 5    please, ma'am, and go walk over in front of that chair, and
 6    then turn and face the Court.
 7              THE WITNESS:  What ramp?
 8              THE COURT:  This ramp right over here.  And then if
 9    you'll go over in front of that chair over there, that's where
10    you're going to sit.  And you will turn and face me and raise
11    your right hand before you sit down.
12       (Witness Sworn)
13              THE COURT:  You may be seated.
14              Mr. Scott, you may proceed.
15              MR. SCOTT:  Thank you, Your Honor.
16                            ELLA BULLOCK,
17       having first been duly sworn, testified as follows:
18                          DIRECT EXAMINATION
19    BY MR. SCOTT:
20    Q   MS. Bullock, if you'll pull the chair up a little bit and
21    speak into that microphone.  Everything is being recorded, and
22    it's so Mr. Bullock can hear you as well.
23    A   Okay.
24    Q   If you would, state and spell your first and last name.
25    A   Ella, E-L-L-A, Bullock, B-U-L-L-O-C-K.
```

1    Q    What is your relationship to Jessie Bullock?

2    A    I'm his wife.

3    Q    How long have y'all been married?

4    A    Forty years.

5    Q    Where do y'all live?

6    A    5031 Thornwood Place, Jackson, Mississippi.

7    Q    And were y'all living there May of 2018?

8    A    Yes.

9    Q    How long have y'all been living there?

10   A    Just about six years.  Going on six years.

11   Q    Do you recall after Mr. Bullock was arrested whether or not

12   he bonded out of jail in Hinds County?

13   A    Repeat.

14   Q    Did Mr. Bullock bond out of jail in Hinds County?

15   A    Yes.

16   Q    Do you recall how much his bond was?

17   A    I want to say like 2,000 or something.

18   Q    Would $2,500 be correct?

19   A    That sounds correct.

20   Q    And that is on kidnapping and felon in possession of a

21   weapon?

22   A    Yes.

23        MR. SCOTT:  Your Honor, if I may, I have a court order

24   to that effect dated the 27th day of August 2018.  I ask the

25   Court accept it as an exhibit in this matter.

```
 1                THE COURT:  Any objection?

 2                MR. KIRKHAM:  No objection.

 3                THE COURT:  All right.  It's received into evidence as

 4   Defendant's Exhibit 1.

 5       (EXHIBIT D-1 MARKED)

 6   BY MR. SCOTT:

 7   Q   How long has Mr. Bullock -- well, y'all have been married

 8   for 40 or so years, correct?

 9   A   Yes.

10   Q   How long have y'all lived in Jackson?

11   A   All our life.

12   Q   And what family does he have in the area?

13   A   He has sisters and brothers here.

14   Q   His daughter, Chelsea -- or y'all's daughter, Chelsea,

15   where does she live?

16   A   Chelsea lives in Southaven.

17   Q   Did she move because of this or for other reasons?

18   A   No.  She's been there.  She's been in Southaven.  She

19   graduated and got a job that located her there.

20   Q   When Mr. Bullock was released in August of 2018, where did

21   he go to live?

22   A   Repeat.

23   Q   Where did he go live when he bonded out of Hinds County

24   Jail?

25   A   With me at 5031 Thornwood Place.
```

 1   Q    Have there been any issues with Mr. Bullock since he bonded

 2   out?

 3   A    No.

 4   Q    Have there been court appearances on these charges in Hinds

 5   County Court?

 6   A    Yes.

 7   Q    Do you recall how many?

 8   A    I say like two.  Maybe two, something like that.  Two.

 9   Q    Has he made all of those court appearances?

10   A    Yes.

11   Q    And he made them there on time, correct?

12   A    Yes.

13   Q    How old is Mr. Bullock?

14   A    He's 59.

15   Q    Fifty-nine?

16   A    Uh-huh (affirmative response).

17   Q    He has diabetes?

18   A    Yes.

19   Q    Any other medical conditions?

20   A    Glaucoma in his eye.  He had surgery and got glaucoma.

21        MR. SCOTT:  Your Honor, I would ask the Court to

22   accept as Defense-2 a printout dated today from the Centers for

23   Disease Control and Prevention of people who are at high risk

24   for severe illness, including the coronavirus, COVID-19.

25        THE COURT:  Any objection?

```
 1              MR. KIRKHAM:  No, Your Honor.

 2              MR. SCOTT:  And I would point out that it includes

 3   diabetes.

 4              THE COURT:  All right.  It's received into evidence as

 5   Defense Exhibit 2.

 6        (EXHIBIT D-2 MARKED)

 7   BY MR. SCOTT:

 8   Q   Are you fearful of Mr. Bullock?

 9   A   No.

10   Q   Would he flee?

11   A   No.

12   Q   Would you ensure that he made his court appearances?

13   A   Yes.

14   Q   And that's despite the allegations that are made against

15   him involving you?

16   A   Yes.

17              MR. SCOTT:  I tender the witness, Your Honor?

18              THE COURT:  Any cross-examination?

19              MR. KIRKHAM:  Yes, Your Honor.

20                            CROSS-EXAMINATION

21   BY MR. KIRKHAM:

22   Q   Good afternoon, ma'am.

23   A   How you doing?

24   Q   My name is Chet Kirkham.  I'm representing the United

25   States of America here today.  Okay?
```

1   A    Okay.

2   Q    You know why we're here?  We're here about a charge that

3   occurred back in 2018 --

4   A    Yes.

5   Q    -- where Mr. Bullock was charged with having a gun?

6   A    Yes.

7   Q    You're aware of that?

8   A    Yeah.  That's what they say.

9   Q    That's what they say?

10  A    Yeah.

11  Q    You talked to the police about that at some point, too,

12  didn't you?

13  A    Did I talk to the police about that at some point, too?

14  Q    Yes, ma'am.

15  A    What you mean did I talk to the police about that at some

16  point?  I don't understand.

17  Q    Exactly what I asked.  Did you speak with police officers

18  about what happened?

19  A    Yes.  Uh-huh (affirmative response).  Yeah.

20  Q    And what did you tell them?

21  A    I mean, not the police officer.  I talked to the attorney,

22  not the police officer.  You know, I didn't even see the police

23  officer to talk to him about it.  There was a gun in the house,

24  but the house -- the gun belongs to me in the house.

25  Q    What about the allegation of him holding a gun against your

1    head?  What did you say about that?

2    A    No, he didn't have a gun against my head.  It was a gun

3    they found in the house.

4    Q    So you never said that to anyone; is that correct?

5    A    No.

6    Q    And you never said that in any kind of a statement?

7    A    No.

8    Q    And that statement, since you didn't make it, it couldn't

9    have been recorded, could it?

10   A    Repeat.

11   Q    If you never made that statement, no one could have

12   recorded you saying that, could they?

13   A    Couldn't have.

14   Q    So when the police arrived at your residence, what did you

15   tell them?

16   A    When the police arrived at my residence?  Well, I left to

17   go with my daughter.  I left with her.  You know, whenever I --

18   you know what I'm saying?  I didn't get to really talk to the

19   police.

20   Q    So you never even saw a police officer that day?

21   A    Not that day.  He came by that night.  I went -- you know

22   what I'm saying?  I left there, and he came by there that

23   night.

24   Q    Who did?

25   A    The police officer.

1    Q    Okay.  And what did you tell them at that time?

2    A    I just told him that we had been having an altercation.  We

3    had been into it, you know, like that.

4    Q    And you never told them anything about a gun?

5    A    He got the gun out of the house.  There was a gun in the

6    house.

7    Q    Yes, ma'am, I understand that the gun was in the house.  My

8    question is, what did you tell the police about the gun?

9    A    I told them that we had a gun in the house.  I was afraid

10   of the gun.  You know, he might use the gun because we had a

11   gun in the house.

12   Q    Repeat that.  I'm sorry.

13   A    That he might use the gun because we had the gun in the

14   house.

15   Q    Why would you be afraid of that?

16   A    Well, you know, when people get into it, you know, things

17   happen sometimes.  You know, people might -- you know what I'm

18   saying?

19   Q    I'm sorry, ma'am.  I don't know.  Would you explain that a

20   little bit more?

21   A    I said, you know, when things happen and you've got a

22   weapon around, people will do anything, you know, sometimes.

23   You're afraid.  You don't know what they're going to do at that

24   time.

25   Q    Were you present when your daughter spoke with the police?

1   A   Was I present when my daughter spoke to the police?

2   Q   Yes.

3   A   Yes.  Uh-huh (affirmative response).

4   Q   Do you know what she told the police?

5   A   She said, "They had been, you know, getting into it."

6   Q   Do you remember what, if anything, your daughter said about

7   a gun?

8   A   Huh-uh (negative response).  I don't remember anything said

9   about a gun.

10   Q   You don't remember what she said, or you don't remember

11   anything being said about a gun?

12   A   I don't remember what she said -- or anything about a gun.

13          MR. KIRKHAM:  Court's indulgence for a moment, please.

14   BY MR. KIRKHAM:

15   Q   What, if anything, did you tell the police or police

16   officer about whether or not Mr. Bullock had been drinking that

17   day?

18   A   What did I tell them?  That he had drinking?  Yes.  He had

19   been drinking then, yeah.

20   Q   How much had he been drinking that day?

21   A   I would say, you know, he had been drinking whiskey, I

22   think, you know.  I don't know the size.

23   Q   I'm sorry, ma'am.  I don't understand.  What did you say?

24   A   Whiskey.  I don't know the size.  You know what I'm saying?

25   I don't drink it.  I don't know the size.

1    Q    Okay.  What had he been drinking?

2    A    Whiskey.

3    Q    Whiskey?

4    A    Yes.

5    Q    Okay.  I'm sorry.  I missed what you said.  I apologize.

6    And you held your fingers apart about, I don't know, a couple

7    of inches; is that right?

8    A    Yes.

9    Q    So he had been drinking a lot of whiskey, or a little bit

10   of whiskey, or in between?

11   A    Well, I would say a little bit or in between or something.

12   I don't know really the exact amount.  I don't know.

13   Q    Was he drunk?

14   A    I think he might have been.  I think he might have been

15   high or drunk or whatever you want to call it.

16   Q    Did you say high or drunk?

17   A    Drunk or something, yeah.

18   Q    Have you ever known Mr. Bullock to use drugs?

19   A    No.

20   Q    Now, you testified a little bit earlier that you were

21   afraid because there was a gun in the house and that things

22   have a tendency to happen when people get into it.  Is that a

23   fair statement?

24   A    Well, you know, when somebody gets mad or something, you

25   know, like that.  But we don't have a gun now in the house.

1   Q   Yes, ma'am.  I'm still talking about that day.

2   A   Nothing but that old rifle that came from my dad.

3   Q   So there was a pistol and a rifle in the house?

4   A   Yes.

5   Q   Did Mr. Bullock know about those guns?

6   A   No.  It's locked up in the closet somewhere.

7   Q   Yes, ma'am.  Did he know about the guns?

8   A   Oh, yeah.  They in the house.  He know they in the house.

9   But they're from my dad for me.

10  Q   Did he ever handle them?  Shoot them?  Take them anywhere?

11  A   Huh-uh (negative response).

12  Q   I'm sorry.  You need to answer out loud, please, ma'am.

13  A   No.

14         MR. SCOTT:  Your Honor, I think we're going a little

15  far afield of what the direct examination was.  I would object

16  at this time.

17         THE COURT:  Overruled.  You're not limited to the

18  scope of direct, but anything that's relevant to the factors

19  that the Court is looking at.  So I find that it is relevant.

20  Overruled.

21  BY MR. KIRKHAM:

22  Q   On direct examination when the defense attorney was asking

23  you some questions, you said that you were not afraid of

24  Mr. Bullock; is that right?

25  A   No, I'm not afraid of him.

1   Q   Have you ever called the police on Mr. Bullock?

2   A   No.

3   Q   You never have?

4   A   I didn't call the police then, no.

5   Q   I'm asking if you have ever called the police on

6   Mr. Bullock?

7   A   In the past.  Long years ago.  You know what I'm saying?

8   Long years ago.  I would say about 15, 20 years ago.

9   Q   How many times was that?

10  A   One time.

11  Q   One time.  And what was that about?

12  A   Just arguing, arguing and -- you know, arguing.

13  Q   So y'all had a verbal argument?

14  A   Yes.

15  Q   And because of that you called the police?

16  A   Uh-huh (affirmative response).

17  Q   Mrs. Bullock, would you say that Mr. Bullock is a violent

18  person or a peaceful person?

19  A   He's peaceful.

20  Q   Do you think he would ever use a firearm on somebody?

21  A   No.

22  Q   You're aware that he's been convicted for using a firearm

23  on two different people, right?

24  A   Huh-uh (negative response).  What's two different people?

25  Q   He was convicted for shooting someone.  He was convicted

1   for aggravated assault for shooting someone, and he was also

2   convicted of manslaughter.  Are you aware of that?

3   A   Huh-uh (negative response).

4   Q   You're not aware of those convictions?

5   A   No.

6   Q   How long have y'all been together?

7   A   Forty years.

8   Q   When were you first married?  What year?

9   A   '78 -- '79.  '79.

10  Q   Were y'all together in 1994?

11  A   Yes, '94.  Uh-huh (affirmative response).

12  Q   So in 1994, you don't remember him being convicted of

13  manslaughter or aggravated assault?

14  A   Yes, I remember a -- I remember something like that.  They

15  said manslaughter.  Because in the meantime, he was there with,

16  you know, a lot of folks and stuff was going.  And when the

17  thing broke out, they put manslaughter on him because they

18  couldn't prove who did what they did.

19  Q   Except he got convicted, didn't he?

20  A   Yeah, he got convicted.  Yeah.

21  Q   So y'all were together in the 2015?

22  A   Yes.

23  Q   And he was convicted of another -- some other felonies

24  then, wasn't he?

25  A   What was that?

1  Q   Well, I'm asking you, ma'am.  Do you know which felonies he

2  was convicted of in 2015?

3  A   No.  That's what I'm saying.  No, I can't recall that.

4  Q   Does attempted aggravated assault on a law enforcement

5  officer and eluding a law enforcement, do those sound familiar

6  at all?

7  A   A law enforcement officer?

8  Q   Attempted aggravated assault on a law enforcement officer

9  and eluding a law enforcement.  Do you remember any charges

10  like that in 2015?

11  A   Huh-uh (negative response).

12  Q   Ma'am, is your daughter, Chelsea, a truthful person or an

13  untruthful person?

14  A   She's very truthful.

15  Q   She's very truthful?

16  A   Uh-huh (affirmative response).

17  Q   So if she told the police that she saw a gun in

18  Mr. Bullock's hand, you would take that as truthful, wouldn't

19  you?

20         MR. SCOTT:  I'm going to object.  We're now at the

21  speculation and wondering what other people said part.  I

22  object.

23         THE COURT:  Sustained.

24         MR. KIRKHAM:  That's all the questions I have, Your

25  Honor.  Thank you.

1          THE COURT:  Any redirect?

2                    REDIRECT EXAMINATION

3   BY MR. SCOTT:

4   Q   Mrs. Bullock, on the day last week when Mr. Bullock was

5   arrested, where were you?

6   A   At work.

7   Q   Where do you work?

8   A   At the Methodist Rehab.

9   Q   What do you do there?

10  A   A rehab tech.

11  Q   I'm sorry?

12  A   A rehab tech.

13  Q   Okay.  So when you left, Mr. Bullock was at the house?

14  A   Yes.

15  Q   Now, you were asked about eluding law enforcement and

16  attempted aggravated assault, somewhat fancy words.  Do you

17  remember Jessie running from the police and getting in trouble?

18  A   Do I -- say that again now.

19  Q   Do you remember Jessie running from the police back in 2013

20  and getting in trouble?

21  A   Running from the policemen?

22  Q   Being put on probation?

23  A   I remember he got up and came home.  You know what I'm

24  saying?  Maybe that's when it was.  And they put him on

25  probation or something, because he had -- you know, he was

```
1    drinking, and he came straight home, and they came to the

2    house, something like that.

3    Q    You recall that, correct?

4    A    Yes.

5    Q    Was he ever revoked for that probation or sent back to jail

6    for any reason?

7    A    Yes, he was in the jail.

8    Q    He was in the jail when he got arrested, correct?

9    A    Yes.

10   Q    And he didn't go back to jail anymore, did he?

11   A    No.

12   Q    So you said you don't fear him, correct?

13   A    Huh?

14   Q    You said you don't fear him?

15   A    No, I don't fear him at all.

16   Q    If you had feared him, you wouldn't have let him come back

17   to the house in August of 2018, would you?

18   A    Correct.

19   Q    Who is Booman Bullock?

20   A    Booman Bullock?  They call my son Booman Bullock.

21   Q    Has Jessie ever gone by the name Booman?

22   A    No.

23   Q    So if it's in the indictment as that, it's wrong?

24   A    It's wrong.  Exactly.

25   Q    Now, I think I asked you this before.  But to be clear,
```

1  he's made several court appearances in Hinds County on these

2  charges, correct?

3  A   Correct.

4  Q   Have you gone with him?

5  A   Yes, every time.

6       MR. KIRKHAM:  Your Honor, this is beyond the scope of

7  cross.  I'm going to object.

8       MR. SCOTT:  But if the rules don't apply, Your

9  Honor --

10      THE COURT:  Well, I try to apply them to some extent.

11  But there was certainly cross-examination about whether he

12  posed a risk of non-appearance or a danger to others of the

13  community, so overruled.

14  BY MR. SCOTT:

15  Q   Have you gone with him to court?

16  A   Yes, every time.

17  Q   And do you know what's going on with that case right now?

18  A   Yes.

19  Q   What's happening in that case?

20  A   Well, he's out on bond.

21  Q   And that's that $2,500 we talked about?

22  A   Yes.

23  Q   And that's a fairly low bond, correct?

24  A   Yes.

25      MR. SCOTT:  Your Honor, I would like a moment to speak

```
 1   with my client.

 2          THE COURT:  All right.  The only way we can facilitate

 3   that is -- I mean, have you got -- Jackie, do you know how to

 4   do it?  You've got to mute everybody except them.

 5      (SHORT PAUSE)

 6   BY MR. SCOTT:

 7   Q   (Inaudible due to audio not started).

 8   A   No.

 9   Q   And to be clear, his health condition is diabetes?

10   A   Correct.

11          MR. SCOTT:  Thank you.  No further questions, Your

12   Honor.

13          THE COURT:  I have to ask questions in this situation.

14   Mrs. Bullock?

15          THE DEFENDANT:  Yes.

16          THE COURT:  No, not Mr. Bullock.  Mrs. Bullock.

17          Your husband was charged and is out on bond for

18   kidnapping, correct?

19          THE WITNESS:  That's what they say, kid- -- the gun.

20   I mean, kidnapping, yeah.  But I don't understand.  Who did he

21   kidnap?  I mean, I never did understand that charge.

22          THE COURT:  That's what I'm asking you.

23          THE WITNESS:  Yeah.

24          THE COURT:  Who is he accused of kidnapping?  Is there

25   a person in your household, or does he have any relationship
```

```
1    with a child 14 years of age or younger?

2              THE WITNESS:  No.

3              THE COURT:  Do you have any children?

4              THE WITNESS:  Yes, I do.  I have two.  They're grown.

5    They don't even live there.

6              THE COURT:  Is there a relative that is 14 years of

7    age or younger --

8              THE WITNESS:  No.

9              THE COURT:  -- that he had custody of for any reason?

10             THE WITNESS:  No.

11             THE COURT:  You referred to your daughter earlier, and

12   you've been asked questions about your daughter.  How old is

13   she?

14             THE WITNESS:  She's (inaudible).

15             THE COURT:  Do you deny under oath here today that

16   your husband, Jessie Bullock, used a gun to threaten you in any

17   way on May the 3rd, 2018, ma'am?

18             THE WITNESS:  Yes.

19             THE COURT:  You deny that?

20             THE WITNESS:  Yes.

21             THE COURT:  Do you deny contacting any law enforcement

22   officers about what was happening at your house on May the 3rd,

23   2018?

24             THE WITNESS:  Yes.  I didn't call the law enforcement.

25             THE COURT:  What do you say your husband, Jessie
```

 1  Bullock, did on May the 3rd, 2018?

 2          THE WITNESS:  He was just arguing, you know, cussing

 3  and arguing, stuff like that, you know.  He accused me of

 4  something that his sister or somebody said.

 5          THE COURT:  All right.  You were asked questions about

 6  whether your husband has been convicted of aggravated assault

 7  and manslaughter.  You seemed to not know what they were

 8  talking about.  Did your -- was your husband sent to prison?

 9          THE WITNESS:  Yes.

10          THE COURT:  For -- when and for how long?

11          THE WITNESS:  Like about 15, 16 years.

12          THE COURT:  All right.  Why?

13          THE WITNESS:  Why?  Because of what he just said they

14  said.  Like I said, something happened there where he was.

15  They were out, you know, somewhere, and something -- in the

16  meantime, somebody got killed.  And they didn't know who it

17  was, so they put it on him (inaudible).

18          THE COURT:  So when did he come back home after being

19  released from prison to live with you?

20          THE WITNESS:  When did he come home?

21          THE COURT:  What year?

22          THE WITNESS:  2000 and -- he's been home about

23  15 years.  I'd say about -- you know, 12 to 15 years, so maybe

24  2002 or 2003.

25          THE COURT:  All right.  In light of the Court's

1  questions, any questions by defense counsel?

2          MR. SCOTT:  Your Honor, since it's my witness, I'll

3  defer to prosecution first.

4          THE COURT:  All right.  Any questions by counsel for

5  the government?

6          MR. KIRKHAM:  No, Your Honor.

7          THE COURT:  Go ahead.

8          MR. SCOTT:  I think, Your Honor, I can somewhat clear

9  up the question about the kidnapping.  There are no small

10 children, and he was charged -- what I have provided you says

11 kidnapping.  However, in Hinds County, he was not indicted for

12 kidnapping.  He was actually indicted for felon in possession

13 of a weapon.  So the kidnapping charges do not appear to have

14 gone further, at least from what I've been provided.  But,

15 initially, I think he was charged by JPD for that.  The

16 original officer, it's my understanding, was a JPD officer.  It

17 has complainant listed.  I don't know who called the police.

18         THE COURT:  All right.

19         MR. SCOTT:  Court's indulgence, Your Honor.

20                 FURTHER REDIRECT EXAMINATION

21 BY MR. SCOTT:

22 Q   So it's fair to say that Jessie came back around 2000, the

23 early part of 2000, correct?

24 A   Correct.

25 Q   And this incident, since it has happened, y'all have been

1   living together since 2018?

2   A    That's right.

3   Q    And y'all were living together before then?

4   A    Yes.

5   Q    And before you had -- and the only other time that y'all

6   had problems and the only time that you called the police on

7   him was some 15 to 20 years prior, correct?

8   A    Right.

9   Q    And so you have no fear of him being in the home with you?

10  A    No.

11  Q    And you don't believe that he would run from his

12  obligations?

13  A    No.

14        MR. SCOTT:  No further questions, Your Honor.

15        THE COURT:  Thank you, Mrs. Bullock.  You're excused.

16  Does the defendant have any additional witnesses or evidence to

17  submit to the Court?

18        MR. SCOTT:  No, Your Honor.

19        MR. KIRKHAM:  Your Honor?

20        THE COURT:  Yes.

21        MR. KIRKHAM:  In rebuttal, I would like to offer the

22  Court of Appeals opinion as to Mr. Bullock's convictions for

23  aggravated assault and manslaughter, which include a statement

24  of facts that came out during the trial, which are

25  contradictory to Mrs. Bullock's rendition of the facts here

1   today, which was that the defendant was simply out and had two

2   felony charges put on him because they didn't know who else

3   might have done it.

4          So I would offer that as Government's Exhibit 2.

5          THE COURT:  Any objection?

6          MR. SCOTT:  I haven't seen it, Your Honor.  I don't

7   know.

8          THE COURT:  Is this the 1994 conviction?

9          MR. KIRKHAM:  Yes, Your Honor.

10          THE COURT:  Okay.

11     (SHORT PAUSE)

12          MR. SCOTT:  Your Honor, no objections.

13          THE COURT:  All right.  It's received into evidence as

14   Government's Exhibit 2 or whatever it would be.

15     (EXHIBIT G-2 MARKED)

16          MR. KIRKHAM:  May I approach, Your Honor?

17          THE COURT:  Yes, you may.  Does the government rest on

18   rebuttal?

19          MR. KIRKHAM:  Yes, Your Honor.

20          THE COURT:  I'll hear argument from the government

21   first.  Go ahead.

22          MR. KIRKHAM:  Your Honor, the nature of the offense

23   weighs in favor of detention.  The defendant is a convicted

24   felon.  He has been charged and indicted apparently not only by

25   a federal grand jury, but also by a state grand jury, for

1   having been in possession of a firearm after having been

2   convicted of a felony offense.

3          The weight of the evidence.  The Court has been

4   presented today with directly contradictory testimony from Ella

5   Bullock to her audio-recorded statement, which Special

6   Agent Parten testified to.  He went so far as to show his

7   handwritten notes from listening to that audio-recorded

8   statement to defense counsel.  Mrs. Bullock made contradictory

9   statements from that audio-recorded statement to her statement

10   here in court today.

11          What's also before the Court is the statement from her

12   daughter, Chelsea Bullock, that Special Agent Parten also

13   testified to.  Both of those statements, those audio-recorded

14   statements, which happened before the proceedings here in Court

15   today, detail that the defendant was in possession of a firearm

16   and used it in a threatening manner on that day.

17          Aside from that, what's uncontradicted is the

18   defendant's own statement that he knew of the firearms and that

19   he, at least fleeting, possessed those firearms in the context

20   of touching it when it was within a drawer.

21          So the weight of the evidence, the government would

22   argue, weighs against the defendant and in favor of detention.

23          His criminal history includes three prior crimes of

24   violence, including manslaughter and aggravated assault.  I've

25   submitted to the Court a copy of the Appellate Court opinion

1  that came after the jury trial in which the defendant was found

2  guilty of both aggravated assault and manslaughter, which

3  involved the use of a firearm.  I think that's relevant to the

4  Court's decision today because Mrs. Bullock testified that the

5  defendant is a peaceful person and that those charges back in

6  1994 were just put on him.

7       I think the Court can see from that opinion and

8  rendition of the facts that came out during a trial, after a

9  jury found him guilty, that there was eyewitness testimony as

10 well as physical evidence and evidence from the defendant

11 himself admitting to firing the firearm involved, all of which

12 came together to find that the defendant acted violently and

13 intentionally in the use of a firearm.  And so those factors

14 weigh in favor of detention as far as being a danger to the

15 community.

16      There is also the fact that the defendant was later,

17 in 2015, convicted of fleeing from a law enforcement officer.

18 That weighs in favor of detention along the lines that the

19 defendant presents a risk of flight.

20      I would also argue that in spite of Mrs. Bullock's

21 testimony here today, that the defendant presents a specific

22 danger to her.  I understand what she testified to.  I

23 understand that he has been out on bond and living with her.

24 The allegation, what the government is proceeding on, is the

25 audio-recorded statement and the statements that were made that

1    day, that the defendant threatened her with a firearm.  And the

2    government -- I understand that he has been out on bond and

3    residing with her.  I don't know what the nature of their

4    relationship is since or then, but I would put before the Court

5    and rely on that evidence -- and he threatened her with a

6    firearm that day -- to support the contention that he presents

7    a specific risk of danger to her, Your Honor.

8         THE COURT:  Thank you.  Any argument on behalf of the

9    defendant?

10        MR. SCOTT:  Your Honor, Mr. Webb sought detention

11   originally.  He sought detention as a risk of flight and a

12   danger to others.  A danger to others is not necessarily what

13   he can move for under the statute, only a danger to others or a

14   danger to the witness.

15        The government argues that he is a danger to

16   Mrs. Bullock.  However, the original indictment in this case

17   was returned in federal court on August 21st, 2018, after

18   Mr. Bullock had already bonded out of Hinds County Jail.  The

19   marshals task force, JPD, the government never sought to find

20   Mr. Bullock.  The government sought an amended indictment in

21   August -- or in October of 2019.  The marshals task force, JPD,

22   the marshals, the government never sought to arrest

23   Mr. Bullock.

24        So he has been out on bond for nearly two years on

25   this case.  And, suddenly, the government wants to argue that

1  he's a danger to the community.  Again, the danger to the

2  community is not relevant under 3142, reason to request for

3  detention.

4       It's only -- so the only other request is that he's a

5  flight risk.  You've heard from Mrs. Bullock that he has made

6  every court appearance on this case; that she has gone with

7  him; that did he not flee.

8       THE COURT:  Hang on just a second.  Let me be clear.

9  So the superseding indictment is for -- I don't have a copy of

10 the original indictment in front of me.

11      MR. SCOTT:  The original indictment was returned

12 August 21st, 2018.

13      THE COURT:  In this court?

14      MR. SCOTT:  Yes, Your Honor.  318-cr-165.  The only

15 difference between that indictment and --

16      THE COURT:  August what?

17      MR. SCOTT:  August 21st, 2018.

18      THE COURT:  2018?

19      MR. SCOTT:  Yes, Your Honor.  After Mr. Bullock had

20 bonded out in Hinds County.

21      THE COURT:  Okay.

22      MR. SCOTT:  The government sought a superseding

23 indictment to add the "knowingly" part of felon in possession,

24 that knowingly -- well, it was knowingly convicted of a felony.

25 That's the only change in the superseding indictment.  It's

1  still the same thing.

2          THE COURT:  Okay.

3          MR. SCOTT:  So the government did not seek to find him

4  at that time.  It was not until this Court had entered -- or

5  the Southern District Court had entered a special order

6  essentially limiting hearings to essential hearings that the

7  marshals task force decided to go out and look for Mr. Bullock.

8          The government attempts to impeach Mrs. Bullock by

9  saying, *Oh, they just put that charge on him.*  But in the facts

10  of the case, as recited by the government and provided to the

11  Court from the government, Mr. Bullock testified at the time

12  that his gun jammed; that the gun was found ten feet behind his

13  car after it was wrecked; that the person that was killed --

14  and that there were no -- there was no firing by Mr. Bullock

15  after the car wreck; that the person who was killed passed by

16  their car after it had been wrecked.  There were multiple

17  gunshots in Mr. Bullock's car.

18          Now, however a jury found it, the original charge is

19  murder.  He was convicted of manslaughter.  Whether or not the

20  jury believed he fired the shots or not is irrelevant.  The

21  government is arguing the facts that Mrs. Bullock said they

22  just put that case on him.  Well, in a sense, they did if you

23  read the faces.

24          Regardless, we're looking at a case that's almost

25  30 years old to argue that he's a danger to the community.  The

1    government argues -- or, yes, that he's a danger to the

2    community.  Again, not a relevant way for the government to

3    seek detention.  They argue that he was placed on five years of

4    probation for eluding and somehow he's a danger to the

5    community -- again, not a relevant request -- or that he's a

6    flight risk.  Yet again, Mrs. Bullock has testified she's not

7    scared of him.  She's been living with him for nearly two years

8    since this incident happened.  The government didn't bother to

9    go look for him if their concern was so great for Mrs. Bullock.

10   And the eluding was so serious that they gave him probation.

11          I don't think the government can argue that he's a

12   danger to the community even if it was a relevant issue.  The

13   only relevant issue that they can seek detention under is what

14   they asked for, was flight risk.  And he is not a flight risk,

15   as Mrs. Bullock testified.  And if the government wants to

16   change their theory that he's a danger to a witness in this

17   case, Mrs. Bullock has testified she's not afraid of him.  The

18   government's own actions show that he is not a danger to the

19   witness because they didn't go pick him up for nearly two

20   years.

21          Mr. Bullock is diabetic.  Under the CDC Guidelines, he

22   is most at risk for COVID-19, no matter what age he is.  And so

23   putting him in jail for this period of time until this case

24   does finally go to trial, is not -- it would do more harm than

25   good.

1    Under the statue, he's eligible for bond.  We would

2    ask the Court to set conditions of bond.  If the Court wants to

3    say that he doesn't drink, that's perfectly acceptable.  It's

4    one of the factors the Court can look at in setting conditions

5    of bond.  If the Court wants to put him on ankle monitoring, --

6    I don't think it's necessary, but those are one on the factors

7    that the Court can look at.  So there are a combination of

8    conditions that can enable him to be released from custody,

9    that he is not a flight risk and that he's not a danger.  And

10   that would allow for his release, as I think has been shown in

11   the testimony provided today.

12       THE COURT:  Thank you.  All right.  The Court

13   considers this matter under 18 United States Code Section 3142,

14   and there are four factors that the Court looks at:

15       One, the nature and circumstances of the offense, that

16   being a felon in possession of a firearm.  Consistent with how

17   I have held in the past because it is not -- there are several

18   things that make up such a charge:  Convicted felon, violating

19   a court ordered restriction, and involves a firearm.

20       The nature of this offense.  I typically do, and do

21   here, find that it weighs in favor of detention.

22       The weight of the evidence against the defendant.  I

23   haven't heard the audio.  I trust that -- I have no reason to

24   believe that the officer's description of what's on the

25   audio-recording of an interview with the wife is not what's on

1    the recording.  But there's going to be a conflict in the

2    evidence in this case, and there's not -- this is not one in

3    which I believe that there is any admission of him being in

4    possession.  It may be a constructive possession case.  There

5    may be an arguable admission on that.  I'm not going to find

6    that the weight of the evidence against the defendant weighs in

7    favor of detention, only because there may be some disputed

8    facts there.  And without having more of the evidence in front

9    of me, I don't think I can find it weighs in favor of

10   detention.

11          The history and characteristics of the defendant.  The

12   defendant is 59 years old.  He's diabetic.  He's been married

13   for over 40 years.  There's been a whole lot of talk and a lot

14   of weight placed on the fact that the defendant was previously

15   convicted of aggravated assault and manslaughter.  That was

16   26 years ago.  And it is -- it has been beneficial for the

17   Court to take a look at what were the facts, what was the

18   setting of that.  And based on this Court of Appeals opinion,

19   it was a bar fight, basically.  The whole thing arose out of a

20   bar fight when the defendant was 32 years old.  He's now 60 --

21   or almost 60.  He's 59.

22          So it's of limited present probative value as to

23   whether he poses a danger to others or the community, what he

24   did in a bar fight when he was 32 years old, with him now being

25   one year from 60 and having been married for 40 years.  He

1    served his time for that.  And for the last 15 to 20 years,

2    he's been living with his wife at home without any evidence

3    before the Court of any problems, and she has testified.  And I

4    will say I found portions of her testimony odd.  I find some of

5    her testimony unreliable and not credible.

6           But there are really two issues in front of me, and

7    that is:  Does he pose a risk of flight, and does he pose a

8    danger to others or the community?

9           The only real evidence before me about anything that

10   would indicate that he may pose a danger to others or the

11   community is to his wife.  And she's come into court and

12   testified under oath that she does not believe that he poses a

13   risk of danger to her.  He was put on a $2,500 bond from state

14   court.  He's been living with her for the last two years while

15   he's been on bond without any incident.  This court -- a grand

16   jury from this court indicted him almost two years ago, and

17   apparently nobody thought that he posed such a risk that they

18   needed to go arrest him and bring him before the Court.  He was

19   indicted August the 21st, 2018.

20          It would be downright silly for the Court at this

21   point to say, despite all of that, that he poses a danger to

22   his wife, contrary to her own sworn testimony, contrary to the

23   time that he's been out on bond from this very incident, and no

24   one feeling that he poses such a danger that they needed to go

25   pick him up as early as August of 2018 when he was first

1    indicted.

2            So the Court finds that with respect to the history

3    and characteristics of the defendant, if you take that out, and

4    that's from 30 years ago and that the only one that is really

5    any presentation that he may pose a danger to the others or the

6    community is the wife and she's testified that -- and they've

7    been married for 40 years, then really, the only prior

8    convictions that I have to look at are that he was convicted of

9    eluding a law enforcement officer and attempted aggravated

10   assault on a law enforcement officer, but it obviously -- it

11   does not appear to have been very serious because he was just

12   put on probation, and he served no time for that.  He served a

13   sentence, according to the pretrial services report, that

14   included no time.

15           So the Court finds that based on the more recent and

16   relevant history and characteristics of the defendant, that

17   they do not weigh in favor of detention.  And I do want to note

18   the pretrial services report also says eight prior failures to

19   appear, but the pretrial services report goes back to the early

20   '90s on history, and it gives me no date for any of these prior

21   failures to appear.  I don't know whether they've been within

22   the last couple of years or they were 30 years ago.

23           So based on the evidence before the Court on the more

24   recent and, therefore, relevant information, the Court finds

25   that the history and characteristics of the defendant do not

1    weigh in favor of detention and would weigh in favor of

2    release, and there has not been clear and convincing evidence

3    that he poses a danger to others or community.

4         As I said, the only testimony about that is from his

5    wife, and it's that she does not fear him.  They've been

6    married for 40 years.  If there was a serious danger to others

7    or the community, it begs the question why the U.S. Attorney's

8    Office or nobody else did anything after he was indicted in

9    2018 and has been out on bond the entire time.  And he's been

10   out on bond without incident.  There's no evidence before the

11   Court of any incident.

12        With all that being considered, the Court finds

13   that -- and I also have to consider, as the statute

14   specifically indicates, I am to consider the condition and any

15   kind of medical conditions of the defendant.  And I think

16   during this time period, the coronavirus pandemic, that age and

17   some other medical conditions are relevant.  They're not

18   carrying the day.  There's been no evidence before the Court of

19   any kind of problem with the coronavirus or any kind of

20   outbreak at the Madison County Jail.  At the same time, I also

21   think it is responsible to take age and medical conditions into

22   consideration.  They will not be the telltale condition or

23   factor that the Court will look at, but only common sense tells

24   you -- common sense tells you that it should be considered.

25        Weighing all of the factors and all of the evidence

1  before the Court, particularly concentrating on things that are

2  much more recent than 30 years ago, the Court finds that the

3  defendant -- that conditions can be set that would reasonably

4  assure the defendant's appearance as required and the safety of

5  other persons in the community.  And, therefore, I'm going to

6  release him on bond.

7          I do need to go over, Mr. Bullock, the conditions of

8  your release.  There should be an appearance bond there and

9  also an order setting conditions of release.  You need to step

10  up and take a look at those.

11          Ms. Handy, do you have those handy?

12          THE DEFENDANT:  Which ones, Your Honor?

13          THE COURT:  One is entitled "Appearance Bond," and one

14  is entitled "conditions" -- how many times have I looked at it

15  and going blank on what it's actually entitled.

16          PROBATION OFFICER:  Your Honor, can we make -- on the

17  record, make sure that before probation goes to the house that

18  any other guns are removed from the house?  And his wife

19  probably needs to hear that.

20          MR. SCOTT:  If I may, I was going to step out and get

21  her.

22          THE COURT:  All right.  She said something about the

23  father's gun or -- I mean, a grandfather's hunting rifle or

24  something?

25          MR. KIRKHAM:  There was a rifle as well as a pistol.

1   She said, if I recall correctly, that there were no guns

2   anymore in the house.

3               THE COURT:  Right.  That was her testimony.  Officer

4   Wilder, did you hear that testimony?

5               PROBATION OFFICER:  I heard as well.  I just wanted

6   her to hear it, because I heard a lot of different things.

7               MR. SCOTT:  I think she's gone.  She has weird hours,

8   Your Honor.  My understanding of testimony is that she said

9   there were no guns in the house now.

10              THE COURT:  That was her testimony.

11              MR. SCOTT:  I'll contact my investigator and have him

12  call her.

13              THE COURT:  Okay.

14              MR. SCOTT:  I'll do that right now while the Court is

15  going over conditions, if that's acceptable?

16              THE COURT:  Yes, that's good.

17              Mr. Bullock?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  I'm placing you on a $10,000 unsecured

20  bond.  I want to go over these conditions with you.  I want to

21  make them -- I want to make it very clear to you that should

22  you violate any of these conditions, your bond would be -- you

23  would be arrested, your bond would be revoked, and you would go

24  to jail.  Do you understand that?

25              THE DEFENDANT:  Yes, sir, Your Honor, I understand

1   that.

2          THE COURT:  All right.  The conditions include the

3   following:  You must not violate any federal, state or local

4   law while on release.  You must cooperate in the collection of

5   a DNA sample if it's authorized by federal law.  You must

6   advise your supervising office in writing before making any

7   change in residence address or telephone number.  You must

8   appear in court as required and, if convicted, must surrender

9   as directed to serve any sentence that may be imposed on you.

10  Your case is set for trial on May the 18th, 2020, at 9:00 a.m.,

11  before District Judge Carlton Reeves.  And you also must sign

12  the original appearance bond that is there in front of you, and

13  you will sign in a moment.

14         The second page includes additional conditions.  They

15  include that you must submit to supervision by the United

16  States Probation Service.  And I will tell you, Mr. Bullock,

17  you must do whatever the probation officer tells you to do and

18  what probation tells you to do.  If you don't and you violate

19  any of those directives from the probation service, that would

20  be a violation of your conditions.  You would be arrested.

21  Your bond would be revoked, and you would go to jail.

22         Do you understand?

23         THE DEFENDANT:  Yes, sir, I understand.

24         THE COURT:  All right.  You must continue or actively

25  seek employment.  You must surrender any passport that you have

1    to the United States Probation Service and you must not obtain

2    a passport or any other international travel document.  You

3    must remain in the State of Mississippi at all times during the

4    pendency of these proceedings unless special permission is

5    obtained.  You must avoid all contact directly or indirectly

6    with any person who is or may be a victim or a witness in the

7    investigation or prosecution of this case.  Obviously, your

8    wife may be a witness in this matter, and you can have contact

9    with her.  She is your wife, and I know that y'all live

10   together.  Otherwise, you are not to have any contact with

11   anyone directly or indirectly.

12          Now, the other witness, that was his daughter, right?

13          MR. SCOTT:  That's correct, Your Honor.  My

14   understanding, though, from Mrs. Bullock's testimony, she lives

15   in Southaven.

16          THE COURT:  Okay.  Also, you must not possess a

17   firearm, destructive device, or any other dangerous weapon.

18   And I want to tell you something else about that provision.

19   You can also be held to be in constructive possession of a

20   firearm, which basically can get as broad as it's in the house

21   with you.  I'm essentially -- I'm telling you, and I'm telling

22   you very clearly, you cannot have any firearms in the house.

23   You can't have any guns at all in the house.

24          Do you understand?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  Now, I don't know whether you have a

2     detached garage or, you know, some type of shed or anything

3     else.  But you can't have any firearms on your property.

4          Do you understand?

5          THE DEFENDANT:  Yes, sir, I understand.

6          THE COURT:  All right.  Also, you are not to use

7     alcohol excessively.  I'm going to be consistent.  That's what

8     I usually put, and that's what I'm going to put here.  You must

9     not use or unlawfully possess narcotic drugs or any other

10    controlled substance unless it's lawfully prescribed to you by

11    a physician.  You must submit to testing to determine whether

12    you have used any prohibited substances.

13         Also, you must report as soon as possible to your

14    supervising officer.  Any contact that you have with law

15    enforcement personnel, regardless of how that comes about,

16    through an arrest, a traffic stop, questioning, anything.

17    Also, you must confer with your supervising officer prior to

18    filling any prescription to assure that it's not on the

19    restricted list and that if it is you get permission to take

20    it.  And you must permit anyone from the United States

21    Probation Service to visit you at home or elsewhere and

22    confiscate any contraband that may be in plain view.

23         If you look at the last page of the order setting

24    conditions of release, it sets forth certain penalties and

25    sanctions that may be imposed if you violate any of these

 1  conditions.  And I am advising you at this time that if you --

 2  I'm not going to go through all of these penalties and

 3  sanctions with you, but it should be sufficient what I've

 4  already told you.  If you violate any of these conditions, your

 5  bond will be revoked and you will go to jail.  I further advise

 6  you that if you violate any of these conditions, it may itself

 7  constitute a separate criminal act for which you could be

 8  prosecuted and convicted.

 9          Do you understand?

10          THE DEFENDANT:  Yes, sir, I understand clearly.

11  (Inaudible) two years ago.

12          THE COURT:  Sir?

13          THE DEFENDANT:  I just said I stopped smoking and

14  drinking -- smoking cigarettes and drinking alcohol two years

15  ago.  When I became a diabetic, I haven't smoked another

16  cigarette or drank any alcohol.

17          THE COURT:  That's a good habit.  Just stick with it.

18          THE DEFENDANT:  (Inaudible).

19          THE COURT:  All right.  Well, do you agree to abide by

20  all of the conditions I'm placing on you?

21          THE DEFENDANT:  Yes, sir.  I understand you clearly.

22          THE COURT:  All right.  You need to sign that bond.

23  On the second page of the appearance bond, it's got a place for

24  defendant's signature.  And then on the third page of the order

25  setting conditions of release, you need to sign that as well.

1          MR. SCOTT:  Your Honor, the waiver of arraignment and

2   enter a plea of not guilty, did we receive that back from --

3          THE COURT:  I don't know.  But she said she was going

4   to send it.

5          MR. SCOTT:  I've got an extra copy if the Court wishes

6   for me to sign it and for the Court to sign.

7          THE COURT:  Yes.  You've got an extra copy that he has

8   signed?

9          MR. SCOTT:  He has not signed.

10         THE COURT:  Oh, okay.  Yeah, go ahead and present

11  that.

12         MR. SCOTT:  If the Court is putting them together, I

13  want to make the Court aware I have it.

14         THE COURT:  Okay.

15    (SHORT PAUSE)

16         THE COURT:  All right.  Mr. Bullock, have you signed

17  the appearance bond and the order setting conditions of

18  release?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  All right.  Any specific instructions from

21  the marshal's service or -- well, from probation in particular?

22         PROBATION OFFICER:  Someone from our office will be in

23  contact with him, Your Honor.

24         THE COURT:  All right.  Mr. Bullock, someone from the

25  United States Probation Service is going to call you.  And you

 1   need to do whatever they tell you to do.  I don't know any

 2   better way to say it.

 3            THE DEFENDANT:  Right.  I understand.

 4            THE COURT:  If you don't hear from them within the

 5   next 24 hours or 48 hours for sure, you need to reach out and

 6   contact them.  Do you understand?

 7            THE DEFENDANT:  Okay.  Yes, sir.

 8            THE COURT:  All right.  And you'll have a copy -- or

 9   you should have a copy --

10            Jackie, he has a copy of the order setting conditions

11   of release, right?

12            The number of the United States Probation Service is

13   on the second page of that order setting conditions of release.

14   All right?

15            THE DEFENDANT:  Yes, sir.  All right.

16            THE COURT:  So if you haven't heard from them in 24 to

17   48 hours, I want you to contact them.

18            THE DEFENDANT:  Will do.  Yes, sir.

19            THE COURT:  Okay.  Yes, sir?

20            MR. SCOTT:  If he is not given the number or cannot

21   contact them because he doesn't have the number, if Mr. Bullock

22   will contact my office, we well help facilitate that.

23            THE COURT:  Did you hear that, Mr. Bullock?

24            THE DEFENDANT:  Yes, sir.

25            THE COURT:  Anything further from the government?

1            MR. KIRKHAM:  No, Your Honor.

2            THE COURT:  Anything further on behalf of the

3    defendant?

4            MR. SCOTT:  Not on this matter, Your Honor.

5            THE COURT:  All right.  The defendant is ordered

6    released on the bond after the necessary processing at the

7    Madison County Jail.  And, otherwise, this matter is adjourned.

8        (Hearing Concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


     I, Amy Key, Official Court Reporter, United States

District Court, Southern District of Mississippi, do hereby

certify that the above and foregoing pages contain a full, true

and correct transcript of the proceedings had in the aforenamed

case at the time and place indicated, which proceedings were

recorded by the courtroom deputy clerk and later transcribed by

me from a digital recording to the best of my skill and

ability.

          I certify that the transcript fees and format

comply with those prescribed by the Court and Judicial

Conference of the United States.


     This the 20th day of May, 2020.



               s/ *Amy Key*
               Amy Key
               Court Reporter