IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**

**V.**  **CRIMINAL NO. 3:18CR165-CWR-FKB**

**JESSIE BULLOCK**

## REPLY IN SUPPORT OF MOTION TO DISMISS

### I. Introduction.

The prosecution's Response ignores *Bruen*'s holding. Instead, the Response relies on pre-*Bruen* Fifth Circuit precedent, *Heller*'s dictum, and concurring opinions. That reliance is misplaced. The U.S. Supreme Court's holding in *Bruen* governs this case.

And Mr. Bullock prevails under that holding. Not a word of the Response addresses the plain text of the Second Amendment, which covers the alleged conduct here. The Response presses the only argument available to it under *Bruen*, asserting that there is a "historical tradition" supporting this application of Section 922(g)(1). But the sources that the Response cites fail to establish that "historical tradition," and in fact undercut the prosecution's required showing. The Court should grant the Motion.

1

## II. The Response ignores *Bruen*'s holding, which governs.

The Response avoids any acknowledgment of *Bruen*'s holding. That holding is not difficult to discern:

> [W]e **hold** that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (emphasis added). *Bruen* reiterated that holding a few pages later:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129-30.

Ignoring what *Bruen* held (and reiterated), the prosecution represents that *Bruen* "focused on the constitutionality of a discretionary gun permit." *See* Response, unnumbered p. 2. In fact, *Bruen*'s holding set out the "standard for applying the Second Amendment," and the Court then "appl[ied] that standard to New York's proper-cause requirement." *Bruen*, 142 S. Ct. at 2129, 2134. The

2

prosecution's attempt to limit *Bruen*'s holding to a single application of that holding lacks all merit.

The prosecution urges this Court to apply pre-*Bruen* (and pre-*Heller*) Fifth Circuit precedent, rather than *Bruen*'s holding. But as Mr. Bullock explained, *Bruen* rejected lower courts' use of means-end scrutiny, including the Fifth Circuit's use of that standard. *Bruen*, 142 S. Ct. at 2129 ("[T]he Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny."). In place of the standard that the Fifth Circuit had used, *Bruen*'s holding set out the "standard for applying the Second Amendment," which governs this case. *Id.* The Response ignores that reality.

The Response fares no better by pointing to a plurality opinion's recitation of *Heller*'s dictum. Again, the Response ignores Mr. Bullock's explanation that *Bruen*'s holding prevails over *Heller*'s dictum. *See* Motion pp. 7-10 (citing *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010)). As *Heller* itself put it: "It is inconceivable that [the Court] would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." *See Dist. of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008). The prosecution's request that this Court do the "inconceivable" is meritless.

In a final attempt to avoid *Bruen*'s holding, the prosecution's Response misreads two concurring opinions. Justice Alito's concurrence, the Response correctly observes, states that *Bruen* does not "disturb[]" *Heller*'s standard for regulating firearms. Response, p. 3. What the Response ignores is that *Bruen* in fact "appl[ies]" the "test that [the Court] set forth in *Heller*," which "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.[1] When read in context, Justice Alito's concurrence observes that *Bruen* involved an application of *Heller* and *McDonald*'s standard, which governs. *See id.* at 2157 (Alito, J., concurring) (noting that *Bruen* did not itself *decide* how other regulations fare under that standard).

For its part, Justice Kavanaugh's concurrence underscores that *Bruen* "employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require." *Bruen*, 142 S.Ct. at 2161 (Kavanaugh, J., concurring). Mr. Bullock agrees that the Court should apply the "text, history, and tradition test" that *Heller*, *McDonald*, and *Bruen* "require."

---

[1] *Bruen* makes that point time and again. *See, e.g., Bruen*, 142 S.Ct. at 2127 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context," but instead "demand[] a test rooted in the Second Amendment's text, as informed by history."); *id.* at 2128–29 ("*Heller*'s methodology centered on constitutional text and history."); *id.* at 2129 (discussing "*Heller*'s historical approach and its rejection of means-end scrutiny"); *id.* at 2134 (explaining that preceding section made "the constitutional standard endorsed in *Heller* more explicit").

The prosecution disagrees. It instead finds "clarity" in a block quote from Justice Kavanaugh's concurrence, which includes the *Heller* dictum. *See* Resp. p. 3. That clarity is unfounded for several reasons.

First, *Bruen* expressly "hold[s]" that the text, history, and tradition test is the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2126, 2129-30. A majority of the Court issued that holding in unambiguous terms, and then reiterated that holding in unambiguous terms. Six Justices signed the majority opinion in full. Second, the Fifth Circuit has already made clear that *Heller*'s dictum is indeed dictum. *Scroggins*, 599 F.3d at 451. And third, Justice Kavanaugh's concurrence, too, makes explicit that Second Amendment cases "require" a "text, history, and tradition test." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring).

We note that the prosecution's Response at page 3 characterizes Mr. Bullock's Motion as "at best, wholly without merit, and, at worst, frivolous." This is quite a bold statement considering that the prosecution's Response ignores *Bruen*'s holding, which governs. *Bruen*, 142 S. Ct. at 2126, 2129-30. Accordingly, the prosecution's argument must be rejected.

### III. The Response ignores the Second Amendment's plain text, which covers Mr. Bullock's alleged conduct.

After ignoring *Bruen*'s holding, the Response proceeds to ignore the Second Amendment's plain text. As Mr. Bullock has explained, that plain text

5

encompasses "possess[ion]" of firearms by "all Americans." Motion, p. 4 & n.2 (quoting *Heller*, 554 U.S. at 580-81, 583; *Bruen*, 142 S. Ct. at 2156).

Without reference to constitutional text, the prosecution implicitly argues that the term "the people" in the Second Amendment protects only "law-abiding, responsible citizens." *See* Response, unnumbered p. 2. That is wrong. "Nothing in the Second Amendment's text draws a [law-abiding/not law-abiding] distinction with respect to the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2134. Once more, the prosecution ignores Mr. Bullock's arguments on this issue, which speak for themselves.

### IV. The prosecution fails to meet its burden of establishing the necessary "historical tradition."

Finally, the prosecution fails to meet its burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. Mr. Bullock's Motion showed that the Fifth Circuit, other courts and jurists, scholars, and the United States itself have observed the lack of a historical tradition supporting Section 922(g)(1). Motion, pp. 4-7. The Response fails to acknowledge any of those sources, let alone refute them.

Instead, the prosecution cites an inapposite case for the proposition that there is a historical tradition of regulating "to prevent guns from falling into the wrong hands." Response, p. 3 (quoting *Abramski v. United States*, 573 U.S. 169, 172

6

(2014)).  The prosecution can make that vague representation only by omitting the beginning of that quote: "Federal law has **for over 40 years** regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands."  *Abramski*, 573 U.S. at 172 (citing Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*) (emphasis added).  As the United States has said before, then, Section 922(g)(1) "is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified."  U.S. Br. at *27-28, *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759 (1st Cir. May 13, 2011).

The prosecution relies on Judge Guirola's recent opinion arising under Section 922(g)(3) – *United States v. Daniels*, No. 1:22-CR-58, 2022 WL 2654232 (S.D. Miss. July 8, 2022).  Response, p. 3.  *Daniels* did not itself address Section 922(g)(1).  Yet that case observed that a footnote in the Fifth Circuit's decision in *Emerson*—which also did not arise under Section 922(g)(1)—drew upon three "secondary sources" to (purportedly) establish that the "restriction on possession of firearms by felons" has a "long and established history in English and American common law."  *Daniels*, 2022 WL 2654232, at *3 (S.D. Miss. July 8, 2022) (citing *United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001)).

*Emerson*'s three footnoted 1980s "secondary sources" do not carry the prosecution's historical burden:

7

- The Dowlut law review article is unsupported by any historical authority. As C. Kevin Marshall explained, that article "cited only the 1903 edition of Thomas Cooley's authoritative *Treatise on the Constitutional Limitations*. . . . The cited discussion in Cooley, however, concerns classes excluded from *voting*. These included women and the property-less—both being citizens and protected by arms rights. When Cooley does address the right to keep and bear arms, one finds this: '[H]ow far it may be in the power of the legislature to regulate the right we shall not undertake to say. Happily there neither has been, nor, we may hope, is likely to be, much occasion for the examination of that question by the courts.'" C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 709–10 (2009).[2]

- The Kates law review article likewise "does not support its key assertion" with historical evidence, as Judge Bibas and then-Judge Barrett have explained. *Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 916 (3d Cir. 2020) (Bibas, J., dissenting). The Kates article "cites only the Massachusetts, New Hampshire, and Pennsylvania ratifying conventions." *Id.* Yet the Massachusetts and New Hampshire conventions "did not propose to disarm all felons," and the Pennsylvania minority proposal "failed to persuade its own convention." *Id.* Then-Judge Barrett, too, dismantled the Kates article's analysis and conclusion. *See Kanter v. Barr*, 919 F.3d 437, 455–58 (7th Cir. 2019) (Barrett, J., dissenting) (concluding that "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons"); *see also, e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009) ("[T]he actual sources Kates relied upon (and which subsequent writers have echoed) are surprisingly thin. Indeed, so far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms.").

- Last, the Halbrook article undermines the prosecution's argument. The article cites no historical support for the underlying proposition. What's

---

[2] Marshall explains that the Dowlut article "also cited three antebellum state constitutions limiting the arms right to 'free white men.' This would have been a dubious citation even before the Fourteenth Amendment, as such a limitation does not appear in the Second Amendment and arose even in those States only a half-century after the Founding, the first apparently being Tennessee, which so revised its 1796 constitution—protecting all 'freemen'—in 1834. If anything, adding the express limitation suggests that arms rights otherwise did extend to free blacks along with other citizens." Marshall, *supra*, at 709 n.76 (citations omitted).

more, Halbrook expressed skepticism of Kates' conclusion. As Halbrook put it, Kates' conclusion may be "suspect in this age of strict criminal liability, victimless crimes, and over-criminalization of previously legal conduct." Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 L. & Contemp. Probs. 151, 152 n.8 (1986).

The prosecution's evidence comes nowhere close to carrying the prosecution's burden.[3]

In sum, the prosecution has failed to establish a "historical tradition" supporting lifetime criminalization of Mr. Bullock's possession of a firearm based on a single, non-violent felony conviction.[4] Because Section 922(g)(1) "addresses

---

[3]  The Response omits *Daniels*' footnote finding additional historical support in *National Rifle Association*. *See* Response, p. 4 (omitting *Daniels*, 2022 WL 2654232, at *3 n.3). That decision supports Mr. Bullock. The Fifth Circuit made clear that Section 922(g)(1) is "of mid-20th century vintage." *Nat'l Rifle Ass'n*, 700 F.3d at 196. It then favorably cited a First Circuit case "explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), 'bears little resemblance to laws in effect at the time the Second Amendment was ratified,' as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.* The Fifth Circuit went on to favorably cite the Larson article discussed above, which concluded that "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment" and that an "originalist argument that sought to identify 1791 or 1868 analogues to felon disarmament laws would be quite difficult to make." *Nat'l Rifle Ass'n*, 700 F.3d at 197 (citing Larson, *supra*, at 1376); Larson, *supra*, at 1376.

[4]  "[I]n our adversarial system, we follow the principle of party presentation. . . . Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6 (quotation marks omitted). In future cases, the prosecution may be able to come forward with historical evidence supporting certain applications of Section 922(g)(1). But it has failed to come forward with that evidence here.

And Mr. Bullock is aware of no evidence that *could* carry that burden here. Even assuming *arguendo* that the historical evidence could establish a historical tradition of disarming dangerous persons, "that power [would extend] only to people who are *dangerous*." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). Justice Barrett continued by noting that Section 922(g)(1) is "wildly overinclusive" toward that end, encompassing an "immense and diverse category" of nonviolent offenses. *Id.*

a general societal problem that has persisted since the 18th century," *Bruen* instructs that "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Bruen*, 142 S. Ct. at 2131.

Yet the prosecution identifies no "distinctly similar historical regulation," which itself makes this a "fairly straightforward" case.  *Bruen*, 142 S. Ct. at 2131.  *Bruen* also instructs courts to assess "why" historical regulations burdened the Second Amendment right.  *Id.* at 2132-33.  The prosecution cited no historical evidence suggesting that the answer to "why" was ever a non-violent felony conviction, or anything analogous to it.  The prosecution has failed to identify even an "outlier" regulation, let alone a "broad tradition" of regulations demonstrating an enduring and accepted restriction on the Second Amendment right.  *Id.* at 2156.  At bottom, the prosecution has failed to "affirmatively prove" that this application

---

The evidence does not support a historical tradition of "virtue"-based restrictions on the Second Amendment right.  Like then-Judge Barrett, Mr. Bullock is aware of "no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights."  *Id.* at 463.  "And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment."  *Id.*  Indeed, "*Heller* forecloses the 'civic right' argument on which a virtue limitation depends."  *Id.* at 469.  Judge Bibas, too, carefully surveyed the evidence supporting a "virtue"-based theory, concluding that the theory is "flimsy" and "not supported by history."  *See Folajtar*, 980 F.3d at 915–20 (Bibas, J., dissenting).  Judge Bibas continued: "Today, because the felony label is arbitrary and manipulable, many felonies are far less serious than those at common law. . . . 'Unvirtuousness' based on the felony label is a mushy standard that sets no limit."  *Id.* at 912.  Courts "should be wary of blessing a 'wildly overinclusive' form of civil death for all felons, far removed from history or danger."  *Id.* at 923.

10

of Section 922(g)(1) is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

## V.  Conclusion.

Applying "the standard for applying the Second Amendment," the Second Amendment's plain text covers Mr. Bullock's alleged possession of a firearm.  The prosecution failed to meet its burden of demonstrating that this application of Section 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."  And so Section 922(g)(1) is unconstitutional as applied.

WHEREFORE, Mr. Bullock respectfully asks this Court to grant his Motion to Dismiss.

Respectfully submitted, September 12, 2022.

> **Omodare B. Jupiter**
> Federal Public Defender
>
> */s/ Michael L. Scott*
> Michael L. Scott (MB # 101320)
> Assistant Federal Public Defender
> N. and S. Districts of Mississippi
> 200 S. Lamar St., Suite 200 North
> Jackson, Mississippi 39201
> Telephone: (601)948-4284
> Facsimile: (601)948-5510
> Email:  mike_scott@fd.org
>
> Attorney for Defendant

## CERTIFICATE OF SERVICE

I, Michael L. Scott, certify that this Reply was filed with the Clerk of the United States District Court for the Southern District of Mississippi on September 12, 2022, using the electronic case filing system, which in turn sent an electronic copy of this Reply to all attorneys of record in this case.

          */s/ Michael L. Scott*
          Michael L. Scott
          Attorney for Defendant