

_____

No. 3:18-CR-165-CWR-FKB

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

JESSIE BULLOCK
A/K/A BOOMAN BULLOCK,

*Defendant.*

_____

ORDER

_____

Before CARLTON W. REEVES, *District Judge*.

The issue in this case is whether the federal statute prohibiting felons from possessing firearms, 18 U.S.C. § 922(g)(1), is unconstitutional.

The battle lines are clearly drawn. Jessie Bullock argues that the statute cannot withstand the Supreme Court's latest decision interpreting the Second Amendment. *See New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

"'Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons,'" he writes. Docket No. 61 at 5 (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)).

The government disagrees. Its four-page brief limits *Bruen* to its facts, arguing that the Supreme Court's new decision "says nothing about the statute at issue in this case." Docket No. 63 at 3. The government then summarily asserts that § 922(g)(1) "is part of the historical tradition of regulating firearms possession." *Id.*

As courts have realized, after *Bruen*, adjudicating the issue presents certain difficulties.[1] *Bruen* instructs courts to undertake a comprehensive review of history to determine if Second Amendment restrictions are "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. In fact, Justice Alito commends the majority for its "exhaustive historical survey." *Id.* at 2157 (Alito, J., concurring).

But historical consensus on this issue is elusive. As the Seventh Circuit put it, "scholars continue to debate the evidence of historical precedent for prohibiting criminals from carrying

---

[1] Since *Bruen*, dozens of courts have been asked to address the constitutionality of state and federal firearms restrictions. *See, e.g.*, *United States v. Price*, No. 2:22-CR-97, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022) (finding unconstitutional 18 U.S.C. § 922(k), which prohibits possession of a firearm with an altered, obliterated, or removed serial number); *Antonyuk v. Hochul*, No. 1:22-CV-986-GTS-CFH, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) (granting in part and denying in part temporary restraining order concerning several New York state firearm restrictions); *United States v. Quiroz*, No. PE:22-CR-104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (finding unconstitutional 18 U.S.C. § 922(n), which prohibits persons under felony indictment from obtaining a firearm).

2

arms." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (collecting authorities); *see also United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting) ("scholars disagree about the extent to which *felons*—let alone misdemeanants—were considered excluded from the right to bear arms during the founding era.").

The *Bruen* Court acknowledged only that "historical analysis can be difficult." 142 S. Ct. at 2130 (cleaned up). "[I]t sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Id.*

That is an understatement.

This Court is not a trained historian. The Justices of the Supreme Court, distinguished as they may be, are not trained historians. We lack both the methodological and substantive knowledge that historians possess. The sifting of evidence that judges perform is different than the sifting of sources and methodologies that historians perform. *See id.* at 2177 (Breyer, J., dissenting) ("Courts are, after all, staffed by lawyers, not historians."). And we are not experts in what white, wealthy, and male property owners thought about firearms regulation in 1791. Yet we are now expected to play historian in the name of constitutional adjudication.

In reviewing the briefing and authorities presented in this case, and after conducting its own research, this Court discovered a serious disconnect between the legal and historical communities. Simply put, "[t]he firearms history that appears in law journals and court briefs is not the firearms history familiar to many mainstream historians." A Right to Bear Arms? The Contested Role of History in Contemporary

Debates on the Second Amendment 187 (Jennifer Tucker et al. eds., 2019) [hereinafter A Right to Bear Arms].

Perhaps the most glaring disagreement is whether the Second Amendment confers a broad, individual right to bear arms, or a more limited, collective right to bear arms.

The Supreme Court decided in 2008 that the individual right was more faithful to the Constitution. "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms," the Court held. *D.C. v. Heller*, 554 U.S. 570, 595 (2008). Historians have now weighed in. They call this the "Standard Model." Patrick J. Charles, *The "Reasonable Regulation" Right to Arms: the Gun-Rights Second Amendment before the Standard Model*, *in* A Right to Bear Arms 167.

Yet "an overwhelming majority of historians remain unconvinced by the Standard Model's interpretation of the Second Amendment." *Id.* at 168.

> The fact remains that since the arrival of the Standard Model Second Amendment in the 1970s, its scholars broke, and continue to break, virtually every norm of historical objectivity and methodology accepted within academia. Minority viewpoints are cast as majority viewpoints. Historical speakers' and writers' words are cast in terms outside the bounds of their intended context or audience. The intellectual and political thoughts of different historical eras are explained from modern vantage point. Historical presumptions or inferences are sold as historical facts. Even worse was that Standard

4

> Model scholars often built one unproven historical presumption or inference on another and another. And in many cases, Standard Model scholars fail to adhere to even the most basic norms of historical objectivity and methodology, such as conducting comprehensive research on each person, topic, or event, and reading and incorporating the seminal accepted works on the subject (or at least distinguishing one's conclusions from said works).

*Id.* This echoes other critiques. "A common theme emerging from that literature is historians' frequent complaint that lawyers just can't seem to get it right." Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1525 (2003).

The problem has gotten more attention since *Bruen*. Historians have been unsparing in their criticism of the decision.

One expert on the Second Amendment called the Court's historical analysis "an ideological fantasy." Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen*'s originalist distortions*, ScotusBlog (June 27, 2022). Another historian noted the "growing number of strictures on what [the Court] counts as historical evidence. There is no method to it, nothing but inconsistency and caprice." Jill Lepore, *The Supreme Court's Selective Memory*, The New Yorker (June 24, 2022). These critiques support an increasingly common attack: that the Court simply "cherry-picked" the historical record to arrive at its ideologically-preferred outcome. Mark Joseph Stern, *Clarence Thomas' Maximalist Second Amendment Ruling Is a Nightmare for Gun Control*, Slate (June 23, 2022).

5

\* \* \*

Not wanting to itself cherry-pick the history, the Court now asks the parties whether it should appoint a historian to serve as a consulting expert in this matter. *See* Fed. R. Evid. 706. This Court is acquainted with the historical record only as it is filtered through decisions of the Supreme Court and the Courts of Appeals. An expert may help the Court identify and sift through authoritative sources on founding-era firearms restrictions.

Within 30 days, the parties shall respond and indicate their position on the appointment of a consulting expert.[2]

**SO ORDERED**, this the 27th day of October, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

---

[2] With this additional time, the Court anticipates that both parties will have ample opportunity to consult with their national FPD and DOJ colleagues.